UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

In re:

BELCHER, DELANDO M.,

       Debtor.

_____/

Case No. 08-52516-wsd

Chapter 13

Hon. Walter Shapero

## OPINION REGARDING DEBTOR'S COUNSEL'S APPLICATIONS FOR COMPENSATION

This matter originally came before the Court upon Counsel's Application for Compensation in Case No. 07-58497. (Docket No. 35). A hearing was held June 16, 2008, which concluded with the Court indicating that it would wait to rule on the matter until counsel filed a fee application in the Debtor's subsequent bankruptcy case, Case No. 08-52516. When the fee application in Case No. 08-52516 was filed, the Court reviewed both applications and requested from counsel an explanation as to why it was necessary for twelve and fourteen professionals and paraprofessionals to work on a single case and how, given that large number of involved people, unnecessary duplication was not inherently involved, among other matters. The Court also sought further explanation as to why $0.25 per photocopy page was a reasonable amount to charge as an expense. Counsel filed supplemental responses to the Court's inquiries.

In Case No. 07-58497, counsel requests fees in the amount of $2,701.37 and expenses of $204.58; in Case No. 08-52516, counsel seeks fees of $3,195.70 and expenses of $203.57. Thus, between the two cases, counsel seeks total fees and expenses of $6,305.22.

These fee applications cause the Court to confront a situation in which legal services, while rendered, were quite possibly done so in an inefficient and what ultimately proved to be ineffective manner, with the end result of dismissal prior to confirmation in each case. Debtor's

1

counsel, the law firm of Weik & Associates, represented Debtor in both cases.[1]

## I.

Section 330 of the Bankruptcy Code provides that after notice and hearing, a court may award an attorney "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). The Court plays a significant role in protecting the assets of the bankruptcy estate and to that end, bears responsibility for ensuring that estate assets are not wasted and that all fees paid from the estate are fully warranted. *In re Allied Computer Repair*, 202 B.R. 877, 881 (Bankr. W.D. Ky. 1996) (citations omitted). Accordingly, it is incumbent upon the Court to independently review each fee application coming before it, whether or not any parties in interest object to such. *Id.*

As a threshold matter, before the reasonableness of any requested compensation is examined, the underlying services must be found to be "necessary," i.e., a benefit to the bankruptcy estate. *Rubner & Kutner, P.C. v. United States Trustee (In re Lederman Enters.)*, 997 F.2d 1321, 1323 (10th Cir. 1993) ("[T]he beneficial nature of legal services must be determined before a reasonableness inquiry may even be conducted…"). It is the burden of the attorney requesting compensation to demonstrate that his or her services were beneficial to the estate. *In re Allied Computer Repair*, 202 B.R. at 886 ("[T]he basic test of recovery requires the applicant to demonstrate that his or her services made a beneficial contribution to the estate or to the creditors."). "Bankruptcy attorneys are not entitled to compensation merely because time recorded was actually expended. Billable hours do not necessarily translate into compensable hours." *In re New Boston Coke Corp.*, 299 B.R. 432, 447 (Bankr. E.D. Mich. 2003).

## II.

The results achieved for the estate is one (an important one) of the factors the Court is required to examine when considering whether services were beneficial to the estate. Both of the

---

[1] Weik has subsequently represented Debtor in a third bankruptcy case, Case No. 08-63006, which similarly ended in dismissal prior to plan confirmation.

cases for which compensation is currently being sought, as well as the referred to subsequent and third case in which Applicant represented the same Debtor, ended with identical results – dismissal prior to plan confirmation. While the dismissals cannot be placed solely at Applicant's doorstep, the Court believes that Applicant's process for handling cases[2] was a material and contributing factor.

Bankruptcy, particularly consumer cases in these days of accelerated job, home and vehicle (actual or threatened) loss, is most often an intensely personal matter for a debtor. It contains the seeds and aspects of trauma and concern by and for a debtor the nature of which demand a relationship between the debtor and the debtor's attorney not unlike in kind, if not degree, that between doctor and patient. At the same time, Bankruptcy Code mandates have

---

[2] In its supplemental filing, Applicant describes its process as follows:

> Stage 1 – First appointment Debtor(s) meets with an attorney who only meets with potential clients to discuss their options.
>
> Stage 2 – Debtor(s) meets with either a legal assistant or paralegal who gathers additional documentation needed in order to prepare bankruptcy petition, schedules, etc. The legal assistant or paralegal sole responsibility is to ensure a smooth process and all documents/information is assessed and accounted for.
>
> Stage 3 – Legal Assistant who's sole responsibility is to prepare petition, schedules, and plan with information gathered from Debtor(s).
>
> Stage 4 – Debtor(s) meets with either a legal assistant or paralegal whose function is to meet with the Debtor(s) to review the documents for filing with Debtor(s) and spot any potential problems. These are the same individuals in Stage 2.
>
> Stage 5 – Either Attorney Edward J. Gudeman or Attorney Sonya N. Goll does a final review of the petition, income, expenses, plan, means test, asset analysis to ensure accuracy.
>
> Stage 6 – Bankruptcy documents get filed with the court.
>
> Stage 7 – Legal Assistant whose sole responsibility is to prepare the file for 341 hearing, contacts Debtor(s) for any documentation needed for the 341 hearing and contacts with the Trustee's re: 341 hearing.
>
> Stage 8 – An attorney prepares and attends the 341 hearing, only one attorney handles all 341 hearings so he/she is proficient with the process.
>
> Stage 9 – One attorney and one paralegal or legal assistant are assigned to the case dependent upon Judge assignment. Prepares any amendments needed prior to confirmation hearing.

3

made the proper delivery of legal services in these situations considerably more expensive - unfortunately, and particularly, for those who can least afford it.  That these essentially clashing concepts simultaneously at work present a considerable challenge to the private lawyer or firm providing such services is undeniable.  But they must somehow be harmonized and balanced in a way that takes them all into account if debtors, their attorneys and the administration of the bankruptcy laws generally are to be appropriately served.

Applicant employs a business model or process which, for want of a better description, approaches that of an assembly line.  It involves a dozen or more different persons handling either different components or different hearings or contact needs of a case, with the final product or goal being a confirmed chapter 13 plan.  The assembly line analogy falls short, however, because at each successive work station in a manufacturing assembly line process, there is not the need for the same review of what went before as there is in a bankruptcy case.  In that setting, it is assumed that what has gone before has been properly done and that it was done is quite obvious, what is most relevant and needed is what is to be done at the current station; a situation made possible by uniformity in production.  Such uniformity does not usually exist in the bankruptcy context.  Any given bankruptcy case may differ widely from the previous or next one.  Affirmative knowledge of what has gone before is needed, and possibly crucial in the successful development of the whole.  While such knowledge can be obtained by extensive and careful record keeping, even that requires review at each step of the way and thereby necessarily involves a certain amount of duplication or being brought up to speed (even more so in situations where the record of prior events is not extensive or carefully documented).

While the purchaser of legal services is most concerned about the end product, e.g., in the context of chapter 13, a confirmed plan and eventual discharge of debts, getting to that point requires both communication and an element of hand holding.  Most importantly, it requires a strong element of continuity of relationship between attorney and client.  Applicant's system, at least as is evidenced by these applications, does not provide such relationship.  Debtors properly and reasonably put a great deal of trust and confidence in "their lawyer."  That is belied in situations where there are an excessive number of individuals working on the same case and communicating with the client to the point where it is not clear exactly who "their" lawyer is.  It

4

08-52516-wsd    Doc 51    Filed 02/05/09    Entered 02/05/09 16:54:12    Page 4 of 7

is not difficult to imagine why a debtor who has no consistency in his contacts with counsel, having to deal with a different person at each turn, is significantly less likely to successfully complete a bankruptcy case than an otherwise similarly situated debtor who received counsel from one or only a few professionals during the course of administration of the case. It is important that a debtor be able to deal with a person they have come to know and can thus trust, rather than one attorney at the intake interview whom the debtor may not deal with again, another attorney at the 341 hearing whom they will never see again, yet another attorney at confirmation whom they may have never met, and numerous other attorneys and paraprofessionals in-between. This does not mean that only one attorney or paraprofessional can work on a case; far from it. What is required is the rendition of services which promises some likelihood of success in *results* as part of a continuing process structured to reach the best result possible under the circumstances of that case. In these cases, Applicant's process for handling cases is clearly wanting in the Court's view, and the noted results thereof are particularly troubling. Counsel represented Debtor in three immediately successive chapter 13 cases, each ending in dismissal prior to plan confirmation, clearly a basis for such conclusions. Either (a) the Applicant's entire representation process was flawed; or (b) its evaluation as to whether a successful case was possible in the first place, was flawed. Either one raises serious questions as to entitlement to the compensation sought.

The Court is also troubled by Applicant's process because of its inherent and obvious inefficiencies. Applicant seeks compensation on an hourly basis and disagrees that there are such inefficiencies, stating in one of its supplemental responses:

> While 12 professionals & paraprofessionals worked on this file, there was little or no duplication, other than perhaps when certain attorneys/paraprofessionals who were working on the file left the firm.

(Docket No. 43, p. 1). Leaving aside the caveat about duplication when certain attorneys or paraprofessionals left the firm (which in any event is not a valid rationale for awarding compensation for duplicative services), the statement that twelve professionals or paraprofessionals could work on the case without duplication defies common sense. As discussed above, in order to render *quality* legal services, the person performing such services

5

must be knowledgeable of the pertinent facts of the specific case. This requires that such person either already possess the requisite knowledge from previous work on the case, or obtain such knowledge by reading through the earlier work and notes of others contained in a case file. As described by Applicant, it appears that their system is dependent upon the latter. Given the involvement of twelve to fourteen professionals and paraprofessionals, such a system is inherently inefficient, imposing otherwise avoidable cost to the estate and creditors.

The other area of the fee applications that concerns the Court is Applicant's attempt to be reimbursed $0.25 per page for photocopies. In response to the Court's inquiry about that expense rate, Applicant responded:

> A charge of $0.25 per photocopy is a reasonable amount to be reimbursed since the court charges $0.50 per photocopy. In addition, Debtor(s) sign a fee agreement which states that they will be charge for expenses such as facsimiles and photocopies.

(Docket No. 43, p. 2). Applicant's reasoning is unpersuasive for the simple reason that § 330(a)(1) provides "reimbursement for **actual**, necessary expenses." (emphasis added). Applicant provided no evidence or indication that a photocopy actually costs them $0.25, and in light of the volume of cases they file, the Court would be quite surprised if their cost was anywhere near that high.[3] The comparison to the amount the Clerk's Office charges for photocopies is irrelevant; first, the Clerk's Office is charging that amount, in part at least, as a revenue source; and second, they are providing a certified copy of a document. While Applicant does state in their fee agreement that the Debtor is to reimburse expenses, there is no indication in the agreement that photocopies are $0.25 per page (or that facsimiles are $2.00 per page for that matter). Given that these charges do not appear to be the **actual** amount of expense that counsel incurred photocopying and faxing, the Court will not allow such charges to be reimbursed in this case as actual and necessary expenses.

---

[3] The Court would note that firms with much smaller case volumes than Weik & Associates have sought photocopy expense reimbursement in the amount of $0.15 and $0.20 per page; while many firms seek no reimbursement at all, considering photocopies as an overhead cost.

**III.**

For the reasons set forth above, the Court exercises its discretion to impose a global reduction on the fees and expenses to be awarded Weik & Associates in these two cases. Pursuant to the fee applications in both cases, and instead of the combined total $6,305.22 sought, the Court awards counsel a total of $1,000.00 for fees and $100.15 for expenses.

An order to effectuate the above is being entered concurrently.

**Signed on February 05, 2009**

                                         **/s/ Walter Shapero**
                                  **Walter Shapero**
                                  **United States Bankruptcy Judge**